

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| **FRED RAHDAR AND KOBRA GHORBANI,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | **Civil Action No. 3:22-CV-00280** |
| **v.** | § | |
| | § | |
| **CITY OF FRIENDSWOOD ET AL.,** | § | |
| | § | |
| *Defendants.* | § | |

---

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Fred Rahdar, (hereinafter "Mr. Rahdar") and Kobra Ghorbani, (hereinafter "Mrs. Ghorbani")(collectively, the "Plaintiffs") by and through undersigned counsel, hereby responds to Defendants' Motion for Summary Judgment,[1] and states as follows:

## I. INTRODUCTION

Friendswood Police Department ("FPD") had an informal, but official, policy of retaliation used to suppress speech and punish people that crossed the most powerful individual in its law enforcement system. Former Friendswood Police Chief Robert Wieners ("Chief Wieners"). Chief Wieners and his commanding officers[2] conspired,

---

[1] *See* ECF #70.
[2] Defendants Wilkerson, Cordero and Price are considered commanding officers, as well as any other Defendant which has a management role.

targeted, retaliated and expropriated the First, Fourth and Fourteenth Amendment rights of Mr. Rahdar and Mrs. Ghorbani after Mr. Rahdar publicly disparaged Chief Wieners and FPD; and, further ordered Friendswood police officers to retaliate, target, surveil, arrest, and criminally charge Mr. Rahdar, Mrs. Ghorbani and Friends Pub ("Targeting Campaign").

Beginning in July of 2020, Chief Wieners and his commanding officers, which included, but are not limited to, Sergeant Michael Cordero ("Sgnt. Cordero"), Lieutenant James Price ("Lt. Price"), and Sergeant Daniel Wilkerson ("Sgnt. Wilkerson") enacted a Targeting Campaign and directed FPD police officers ("FPD Officers") to target and harass Mr. Rahdar, Mrs. Ghorbani,[3] and Friends Pub. FPD Officers who did not feel comfortable targeting Mr. Rahdar, Mrs. Ghorbani, and Friends Pub were admonished and disciplined by their commanding officers.

The Targeting Campaign required, among other things, that FPD Officers: (1) drive by Friends Pub and look for opportunities to arrest Mr. Rahdar and Mrs. Ghorbani; (2) surveil the Friends Pub parking lot and the Friends Pub; (3) surveil Friends Pub customers leaving the parking lot and pull them over a mile down the road for DUI's; (4) follow Mr. Rahdar and Mrs. Ghobrani's vehicles and pull them over; and (5) conduct bar checks at Friends Pub, sometimes, up to three times a day. Due to the frequent surveillance by FPD Officers and the history of FPD Officers targeting his customers,

---

[3] Plaintiffs do not dispute that Mrs. Ghorbani was not arrested on February 5, 2021, nor was she subjected to any other deprivation of her rights on February 5, 2021. *See* MSJ, pg. 1, ¶ 4.

Mr. Rahdar was on high alert when FPD Officers would park in his parking lot and wait in their vehicles.

Prior to 2020, Mr. Rahdar had never been arrested. However, between June of 2020 and February 5, 2021, FPD Officers arrested Mr. Rahdar on four occasions. Each time Mr. Rahdar would publicly disparage Chief Wieners and FPD through billboards, media interviews, websites and social media, the Targeting Campaign would escalate.

This litigation is presently centered around the February 5, 2021 arrest (the "Arrest"), where Defendants again took an opportunity to target Mr. Rahdar and arrest him without probable cause for stopping his vehicle in front of Sgnt. Cordero's empty police vehicle to ask him a question regarding the surveillance of the Friends Pub parking lot. There is much more to the story than Defendants present, and that is substantially where genuine issues of material fact inhere.

For starters, Defendants' Motion for Summary Judgment is premature. On August 11, 2024, Mr. Rahdar was contacted by ex-FPD police officer Jesse Beckwith (the "Whistleblower") who disclosed, among other things, numerous details of an illegal Targeting Campaign as well as a history of FPD commanding officers training new officers in the "art" of sidestepping probable cause for certain arrests. Not only did the Whistleblower inform the City of Friendswood about the rampant corruption prior to resigning from his job, the Whistleblower also spoke with local attorneys. However, the City of Friendswood chose to ignore the Whistleblower's facts. After Plaintiffs have

taken 11 depositions and Defendants have supplemented their initial disclosures three (3) times, Defendants failed to disclose the Whistleblower, the Targeting Campaign, the official policy of sidestepping probable cause for certain arrests, and the subsequent discipline of FPD Officers for non-compliance with the Targeting Campaign. Instead, Defendants chose to conceal their actions through non-disclosure and deposition testimony which was untruthful. All actions were in contravention of their obligation under Rule 26(a)(1) and Rule 34 to produce and supplement fact discovery.

For the following reasons, Defendants' Motion for Summary Judgement should be denied.

## II. STANDARD OF REVIEW

### A. F.R.C.P. 56(a) Summary Judgement

Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact" such that it "is entitled to judgement as a matter of law."[4] Whether there is a genuine dispute as to a material fact depends on whether the evidence presents a sufficient disagreement to require submission to the factfinder or, conversely, is so one-sided that one party must prevail as a matter of law.[5] The evidence of the non-movant is to be believed, and all justifiable inferences are to be

---

[4] *See* Fed. R. Civ. P. 56(a).
[5] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) ("at the summary judgement stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

drawn in his favor.[6]  The "plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor.  If he does so, there is a genuine issue of fact that requires a trial."[7]

Defendants assert they are entitled to summary judgment on each of Plaintiffs' remaining claims.  However, there are at least three fatal flaws with Defendants' Motion, namely, there are numerous genuine disputed issues of fact that should be properly placed before a factfinder, the Motion is premature because Plaintiffs require additional discovery that Defendants have withheld and intentionally concealed,[8] and, even if the facts were all undisputed, they are insufficient to support summary judgement.

**B.  42 U.S.C. § 1983**

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law…"[9]

The First Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment to the United States Constitution and

---

[6] *Id*. at 255.
[7] *Id*. at 257.
[8] *See* Plaintiffs' Mot. for Continuance, ECF, #83.
[9] *See* 42 U.S.C. § 1983.

enforceable pursuant to 42 U.S.C. § 1983, provides that states may not abridge the freedom of speech.

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons…against unreasonable searches and seizures, shall not be violated…"

### III. NATURE AND STAGE OF THE PROCEEDING

1.   On August 15, 2024, Plaintiffs filed *Rahdar v. Friendswood Police Department*, No. 3:24-CV-00235, or Rahdar II.

1.   On August 26, 2024, Defendants filed their Motion for On February 17, 2023, Plaintiffs filed their First Amended Complaint.[10]

2.   On August 11, 2024, Plaintiff Fred Rahdar ("Mr. Rahdar") was contacted by Jesse Beckwith a police officer who was employed from 2020-2023 by the Friendswood Police Department ("FPD") (the "Whistleblower").[11]

3.   On August 14, 2024, Counsel for Plaintiffs had an hour-long conversation with the Whistleblower, who gave detailed information regarding the Targeting Campaign, which was an intentional and concerted campaign enacted by former FPD Chief Wieners ("Chief Wieners") and his commanding officers to target and harass Plaintiffs and their business, Friends Pub.[12]

---

[10] *See* ECF, #27.
[11] *See* ECF, #83-1, 1:3-4.
[12] *See Rahdar v. Friendswood Police Department, et al.*, 3:24-cv-00235  (hereinafter "*Rahdar II*"); *see also* ECF, #83-1, 2:13-20; *see also* ECF, #83-1.

4. Defendants file their Motion for Summary Judgement.[13]

5. During the depositions of many of the Defendants, counsel for Defendants instructed Defendants not to answer questions regarding their employment file or Officer Sara Carter. On September 3, 2024, Mr. Rahdar filed a Motion to Compel this information which was subsequently denied by the Magistrate Judge.[14] The Motion to Compel and the subsequent ruling were filed before Mr. Rahdar's counsel spoke with the Whistleblower. The Whistleblower told Mr. Rahdar and his counsel that he was written up/reprimanded for not ticketing Mr. Rahdar.[15] Similar to the Whistleblower's personnel file, the personnel files of Defendants may contain information related to reprimands for failing to ticket, arrest, or harass Mr. Rahdar. Additionally, the Whistleblower provided information related to Officer Sara Carter that relates to, among other things, probable cause for Mr. Rahdar's arrest and the targeting campaign directed by Defendants at Mr. Rahdar.[16]

6. On October 10, 2024, Plaintiffs filed their Motion for Continuance[17] Pursuant to F.R.C.P. 56(d).[18]

---

[13] *See* ECF, #70.
[14] *See* ECF, #72.
[15] *See* ECF, #83-2, ¶¶ 4-5.
[16] *See* ECF, #83-2, ¶¶ 17 & 20.
[17] *See* ECF, #83.
[18] *See* ECF, #83.

## IV.  WHISTLEBLOWER FACTS

7.  The Targeting Campaign required police officers to surveil Plaintiffs and their business, harass Plaintiffs and their business through "bar checks," and arrest Plaintiffs, place them in handcuffs and immediately notify Chief Wieners or one of his commanding officers.[19]

8.  The Whistleblower stated that the Targeting Campaign was enacted to retaliate against Plaintiffs and their business because they used billboards, websites, and media interviews to speak out against FPD, the Mayor of Friendswood, Texas and Chief Wieners.[20]

9.  FPD Officers were afforded no discretion regarding whether to arrest Plaintiffs or cite Friends Pub.[21]

10.  The Whistleblower claimed that it was common knowledge that Mr. Rahdar would be handled differently than any other person.[22]  Additionally, the Whistleblower was unaware of any other persons or entities, other than Mr. Rahdar, Mrs. Ghorbani and Friends Pub, who were targeted by Friendswood Police.[23]

11.  Defendant Daniel Wilkerson disciplined the Whistleblower for using his discretion and issuing Mr. Rahdar a warning instead of a ticket.[24]

---

[19] *See* ECF, #83-2, ¶¶ 3-16, 19-29, 32.
[20] *See* ECF, #83-2, ¶¶ 15, 23, & 29.
[21] *See* ECF, #83-2, ¶¶ 4-5.
[22] *See* ECF, #83-2, ¶¶ 7-13.
[23] *See* ECF, #83-2, ¶ 18.
[24] *See* ECF, #83-2, ¶ 5.

12. Defendants were required to disclose the Whistleblower, the Targeting Campaign, and the subsequent discipline of FPD Officers for non-compliance. Defendants chose to conceal their actions which were in contravention of their obligation under Rule 26(a)(1) and Rule 34 to produce and supplement fact discovery.[25]

## V.  ARGUMENT

### A. Genuine Disputes of Material Facts Exist Regarding Mr. Rahdar's Claim for False Arrest Pursuant to the Fourth Amendment.

"History shows that governments sometimes seek to regulate our lives finely, acutely, thoroughly, and exhaustively.  In our own time and place, criminal laws have grown so exuberantly and come to cover so much previously innocent conduct that almost anyone can be arrested for something.  If the state could use these laws not for their intended purposes but to silence those who voice unpopular ideas, little would be left of our First Amendment liberties, and little would separate us from the tyrannies of the past or the malignant fiefdoms of our own age.  The freedom to speak without risking arrest is 'one of the principal characteristics by which we distinguish a free nation.'"[26]

To sufficiently plead a constitutional claim for false arrest, a plaintiff must allege "that [the arresting officers] did not have probable cause to arrest him."[27]  Probable cause

---

[25] *See* ECF, #83, ¶ 14.
[26] *Nieves v. Bartlett*, 587 U.S. 391, 413 (2019) (GORSUCH, J, concurring in part and dissenting in part) (quoting *Houston v. Hill*, 482 U.S. 451, 463 (1987)).
[27] *See Anokwuru v. City of Houston*, 990 F.3d 956, 963 (5th Cir. 2021)(quoting *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004)).

exists when there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."[28]

### i. There Was No Probable Cause to Arrest Mr. Rahdar For Either Obstruction or Unlawful Restraint.

Defendants argue that Sgnt. Cordero "personally observed probable cause to arrest [Mr.] Rahdar"[29] for Texas Penal Code §42.03, obstructing a highway or passageway ("Obstruction").[30] However, the undisputed facts show that the Arrest was another prong of the Targeting Campaign and Sgnt. Cordero's order to arrest Mr. Rahdar was retaliatory. For the following reasons probable cause did not exist for the Arrest.

First, all Defendants who were present for the Arrest had knowledge and/or were complicit in the Targeting Campaign.[31] Second, the body worn camera footage was allegedly intentionally destroyed in violation of FPD's own policies.[32] FPD Officers destroyed the footage because they were aware there was no probable cause for Mr. Rahdar's arrest. Third, when Lt. Price arrested Mr. Rahdar, Mr. Rahdar was lawfully standing next to his pickup truck and Sgnt. Cordero was yelling at Lt. Price to arrest Mr.

---

[28] *See Michigan v. DeFillippo*, 443 U.S 31, 37 (1979)(citations omitted).
[29] *See* MSJ, pg. 8, ¶ 27; Sgnt. Cordero did not arrest Mr. Rahdar, Lt. Price arrested Mr. Rahdar. *See* Exhibit A, 1:17:36; *see also* Exhibit B, pg. 15:18-22.
[30] *See* MSJ, pg. 3, ¶ 13.
[31] *See* ECF, #83-2, ¶¶ 3, 6-10, 12, 14, 18, 19-20, 22-24, & 32.
[32] *See* ECF, #83-2, ¶ 16; *see also* Ex. 23, pgs. 1-4.

Rahdar and not to speak to Mr. Rahdar.[33] Fourth, FPD has a history[34] of training its officers to effectuate arrests without probable cause and either turning a blind eye to any complaints or retaliating against.[35]

Sgnt. Cordero testified that on February 5, 2021,[36] he had a standing walk in appointment time with his barbershop, Q-Cuts which was located two doors down from Friends Pub.[37] Sgnt. Cordero described the brevity of his haircut walk-in wait time, claiming that he had a "standing [haircut] appointment where [he] walk[s] in and walk[s] out if [the barber] is available"[38] and if the barber is not available Sgnt. Cordero will "pass and come another day."[39] However, Sgnt. Cordero arrived at the Friends Pub parking lot and for approximately thirty (30) minutes (prior to even determining his walk-in wait time)[40] he sat in his vehicle surveilling the parking lot.[41] After exiting his vehicle to determine if his barber was even available for his hair appointment, Sgnt. Cordero re-entered his vehicle and waited approximately fifteen (15) additional minutes to walk into

---

[33] *See* Ex. B, pg. 15:13-17; *see also* Ex. A, 1:17:17-1:17:45.
[34] *See* Exhibit C, 98-106, 142-163, 192-196; *see also* ECF, #83-2, ¶¶ 17, 19-20.
[35] *See* ECF, #83-2, ¶¶ 19-20.
[36] In spite of the fact that the February 5, 2021, Incident/Investigation Report (*see* Exhibit D) includes Defendant Officer Austin Caballero, Plaintiffs acknowledge that Defendants have offered evidence that purports to show Officer Austin Caballero was not working on February 5, 2021. *See* Exhibit E. Additionally, Plaintiffs are aware that while listed on the Arrest Report as assisting with the Arrest, deposition testimony of Officers Wilkerson (Exhibit F, 12:16-13:5), Kulhanek (Exhibit G, 9:15-10:1), and Ruthstrom (Exhibit H, 9:22-10:11) claim they were not present at the scene when Mr. Rahdar was arrested.
[37] *See* Exhibit I; *see also* Exhibit J, pg. 24:12-14.
[38] *See* Ex. J, 25:9-10.
[39] *See* Ex. J, 24:12-14.
[40] *See* Exhibit K, ¶ 10; *see also* Ex. A, 14:34; 44:25.
[41] *See* ECF, #83-2, ¶ 10.

Q-Cuts for his haircut.[42]  Due to the length of time Sgnt. Cordero was sitting in his parked vehicle,[43] Mr. Rahdar began to take notice of him.

Since 2020, when Mr. Rahdar decided to keep his business open during COVID-19 and began speaking critically against FPD, Chief Wieners, and the Mayor of Friendswood, TX, surveillance had become the norm.[44]  The frequent surveillance became noticeable due to the length of time the FPD Officers would sit parked in the Friends Pub parking lot, which averaged 30-45 minutes.[45]  FPD would even post an officer in the Friends Pub parking lot who would watch customers leaving Friends Pub.[46] The officer would then communicate to other FPD Officers who were stationed roughly a mile down the road and who would pull over the customers leaving Friends Pub.[47]

On February 5, 2021, when Sgnt. Cordero was parked in the Friends Pub parking lot, Mr. Rahdar walked over to the vehicle to confirm that it was a vehicle belonging to City of Friendswood.[48]  Once Mr. Rahdar confirmed it was a City of Friendswood car, he walked over to the driver side window and asked Sgnt. Cordero to roll his window down.[49]  Mr. Rahdar wanted to ask Sgnt. Cordero a question.[50]  Due to the length of time

---

[42] *See* Ex. A, 46:34; 58:47.
[43] *See* Exhibit L, 9:3-10:7; *see also* Ex. A, 14:34; 44:25; *see also* ECF, #83-2, ¶ 10 .
[44] *See* Ex. L, 10:12-20; 12:14-15:3; 15:24-17:19; *see also* ECF, #83-2, ¶¶ 10 & 23.
[45] *See* Ex. L, 13:1-4; 16:12-15; 18:12-15.
[46] *See* Ex. L, 13:18-14:25.
[47] *See* Ex. L, 13:18-14:25.
[48] *See* Ex. L, 21:2-6.
[49] *See* Ex. L, 23:1-24.
[50] *See* Ex. L, 23:22-24.

Sgnt. Cordero was sitting in his parked vehicle[51] Mr. Rahdar wanted to ask Sgnt. Cordero what he was doing and whether Sgnt. Cordero was surveilling his business.[52] However, Sgnt. Cordero refused to roll his window down or even acknowledge Mr. Rahdar.[53] Instead, Sgnt. Cordero picked up his cell phone and started filming Mr. Rahdar.[54]

Because the parking lot was a private parking lot,[55] Mr. Rahdar, as a business owner and tenant was lawfully allowed to request that Sgnt. Cordero leave the parking lot. However, Sgnt. Cordero remained in his vehicle refusing to respond to Mr. Rahdar. Eventually, Mr. Rahdar left and went into the Mexican restaurant[56] and Sgnt. Cordero went into Q-cuts for his haircut.[57] Because Mr. Rahdar was leaving for the day[58] Mr. Rahdar did not see Sgnt. Cordero exit his vehicle and go into Q-Cuts.[59]

When Mr. Rahdar drove around and saw Sgnt. Cordero's vehicle still parked in the parking lot,[60] Mr. Rahdar noticed that Sgnt. Cordero was no longer in his vehicle.[61] Mr. Rahdar stopped his truck in front of Sgnt. Cordero's empty vehicle and decided to wait for Sgnt. Cordero to ask him why he had been sitting in the parking lot[62] for

---

[51] *See* Ex. L, 9:3-10:7.
[52] *See* Ex. L, 23:22-24.
[53] *See* Ex. L, 24:2-10; *see also* Ex. A, 56:30.
[54] *See* Ex. L, 24:18-22; *see also* Ex. J, 30:9-13.
[55] *See* Exhibit M; *see also* Ex. J, 94:10-11.
[56] *See* Ex. J, 29:14-16.
[57] *See* Ex. A, 58:44.
[58] *See* Ex. L, 30:1-11.
[59] *See* Ex. L, 26:1-4.
[60] *See* Ex. L, 25:20-25.
[61] *See* Ex. L, 25:20-25.
[62] *See* Ex. L, 26:1-20.

approximately forty-five (45) minutes surveilling the Friends Pub parking lot.[63] However, amid pulling over and waiting to speak with Sgnt. Cordero for fifteen (15) minutes,[64] Mr. Rahdar became distracted by his phone[65] and did not see Sgnt. Cordero enter his vehicle.[66]

Sgnt. Cordero admits to creating the situation which ultimately resulted in Mr. Rahdar's arrest. Sgnt. Cordero claims that his appointment was at 2:00 pm,[67] yet he arrived forty-five (45) minutes early and sat in his parked vehicle.[68] When Sgnt. Cordero exited the barber shop and saw a truck stopped in front of his vehicle, instead of asking Mr. Rahdar to move his vehicle, Sgnt. Cordero entered his vehicle and immediately called for backup on his police radio.[69] Sgnt. Cordero never asked Mr. Rahdar to move and while Sgnt. Cordero testified that Mr. Rahdar was "yelling and screaming and hollering at [him],"[70] Mr. Rahdar was not even aware that Sgnt. Cordero had entered his vehicle.[71] Notably, Mr. Rahdar did not know Sgnt. Cordero was in his vehicle until the other officers arrived.[72]

---

[63] *See* Ex. K, ¶ 10; *see also* Exhibit N, ¶ 16; *see also* Ex. A, 14:30-58:44.
[64] *See* Ex. A, 1:01:52-1:17:17.
[65] *See* Ex. L, 42:10-16.
[66] *See* Ex. L, 42:10-16.
[67] *See* Ex. I.
[68] *See* Ex. K, ¶ 10.
[69] *See* Ex. J, 33:8-34:15.
[70] *See* Ex. J, 31:4-6.
[71] *See* Ex. L, 28:2-6; 42:10-16.
[72] *See* Ex. L, 28:7-13.

Simply because Mr. Rahdar wanted to ask Sgnt. Cordero a question[73] Sgnt. Cordero: (1) refused to speak to Mr. Rahdar;[74] (2) called for police officer assist;[75] and (3) jumped out of his vehicle and ordered Lt. Price to immediately arrest Mr. Rahdar.[76] Sgnt. Cordero would not even allow Lt. Price to interview Mr. Rahdar and instead screamed "arrest him!"[77] While Sgnt. Cordero colored Mr. Rahdar's actions as "not a normal…person,"[78] "very agitated,"[79] and Mr. Rahdar's actions made Sgnt. Cordero "in fear for his life,"[80] the video evidence shows otherwise. Other than Mr. Rahdar requesting that Sgnt. Cordero leave a private parking lot, there is no evidence of Sgnt. Cordero's descriptive accusations of Mr. Rahdar's behavior on the video or elsewhere. However, even if Mr. Rahdar had acted as described, Sgnt. Cordero admitted that "screaming and yelling[81]…and videotaping[82]…and ordering [Sgnt. Cordero] to leave[83]…is not illegal[84]."

Ultimately, and as argued *supra* and *infra*, probable cause did not exist for the Arrest.

---

[73] *See* Ex. L 23:22-24.
[74] *See* Ex. L, 24:2-10.
[75] *See* Ex. J, 33:8-34:15.
[76] *See* Ex. L, 35:6-11.
[77] *See* Ex. L, 37:20-24.
[78] *See* Ex. J, 26:15.
[79] *See* Ex. J, 28:21.
[80] *See* Ex. J, 31:23-25.
[81] *See* Ex. J, 26:16.
[82] *See* Ex. J, 26:16.
[83] *See* Ex. J, 26:24.
[84] *See* Ex. J, 27:6-8.

### 1. Texas Penal Code § 42.03 – Obstructing Highway or Other Passageway.

A review of Texas caselaw applying Obstruction, supports the conclusion that no reasonable officer would conclude that probable cause existed to arrest Mr. Rahdar.[85] Texas courts seize upon specific key facts in determining whether conduct rises to the level of obstruction under § 42.03. Courts look to whether a person disobeyed a reasonable request to move by the officer.[86] Courts also look to whether a person stopped another person's movement as opposed to "walking, approaching, harassing and delaying" a person.[87] Lastly, courts must consider the balance between Mr. Rahdar's constitutional rights and the goals of law enforcement.[88]

Here, Mr. Rahdar did not stop or prevent Sgnt. Cordero's exit out of the parking space because Mr. Rahdar pulled up in front of an empty vehicle.[89] Moreover, Mr. Rahdar did not disobey a reasonable request by Sgnt. Cordero to move his vehicle,

---

[85] *See Davidson v. City of Stafford*, 848 F.3d 384, 393-94 (5th Cir. 2017).

[86] *See Haye v. State*, 634 S.W.2d 313, 315 (Tex. Crim. App. 1982); *see also Russell Zinter v. Salvaggio*, 610 F. Supp. 3d 919, 937 (W.D. Tex. 2022)(citing *Hardy v. State*, 281 S.W.3d 414, 424 (Tex. Crim. App. 2009)(the Texas Court of Criminal Appeals has explained that, "[i]f a parade is approaching and an authority orders [people] to get off the road and they do so," no crime has occurred.).

[87] *See Davidson*, 848 F.3d at 393; *Compare Sherman v. State*, 626 S.W.2d 520, 528 (Tex. Crim. App. 1981) (no obstruction where a defendant caused a momentary stop by walking in front of a car), *with Haye*, 634 S.W.2d at 314-15 (obstruction where a defendant stood on the sidewalk and forced an individual to walk around him and through mud).

[88] *See Davidson*, 848 F.3d at 393; *see also Sherman*, 626 S.W.2d at 528 ("By requiring [under § 42.03] that passage be severely restricted or completely blocked . . . we give ample breathing room for the exercise of First Amendment rights. At the same time, such a definition adequately protects the right of the public to have access to the . . . premises.")

[89] *See* Ex. L, 26:1-20.

because Sgnt. Cordero refused to speak to Mr. Rahdar.[90]  Mr. Rahdar was not aware that Sgnt. Cordero had entered the vehicle.[91]  Any delay caused by Mr. Rahdar was based on Mr. Rahdar hoping to ask Sgnt. Cordero a question.[92]  Defendants' argue that Mr. Rahdar admitted to blocking Sgnt. Cordero's vehicle;[93] however, Defendants misconstrue Mr. Rahdar's testimony.  Mr. Rahdar admitted to pulling up in front of an empty car.[94] Additionally, there is zero evidence that Mr. Rahdar colluded with his employee, Jazmine Lowery to park behind Sgnt. Cordero's vehicle.[95]  Finally, six (6) cars easily passed by Mr. Rahdar[96] and when the seventh (7) car approached Mr. Rahdar to park, he moved his truck.[97]  Ultimately, Mr. Rahdar did not stop any person's movement.

## 2.  Texas Penal Code § 20.02 – Unlawful Restraint

"Probable cause is determined based on the validity of the arrest, not the validity of each individual charge made during the course of the arrest."[98]  On August 16, 2022, Galveston County issued an arrest warrant for Mr. Rahdar for the February 5, 2021 events pursuant to TPC § 20.02, or unlawful restraint.[99]  This charge along with

---

[90] *See* Ex. J, 31:4-6 & 32:22-33:1.
[91] *See Davidson*, 848 F.3d at 393; *see also* Ex. L, 28:7-13 & 42:10-16.
[92] *See* Ex. L, 23:22-24.
[93] *See* MSJ, pg. 6 ¶22.
[94] *See* ECF, #70-9, 26:1-20.
[95] *See* Ex. L, 30:14-15; 31:3-15.
[96] *See* Ex. A, 1:02:09; 1:05:29; 1:05:47; 1:06:14; 1:08:00; & 1:12:38; *see also Ikhinmwin v. Rendon*, No. SA-16-CV-184-OLG (HJB), 2017 U.S. Dist. LEXIS 223816, at *18-20 (W.D. Tex. Oct. 2, 2017).
[97] *See* Ex. A, 1:15:02.
[98] *See Price v. Roark*, 256 F.3d 364, 369 (5th Cir. 2001).
[99] *See* Exhibit O; *see also* Rahdar II.

Obstruction were eventually dismissed by the Galveston County District Attorney at the request of Sgnt. Cordero.[100]

"A person commits an offense [of unlawful restraint] if he intentionally or knowingly restrains another person."[101]   In the last 10 years, the FPD has effectuated five (5) arrests for unlawful restraint.[102]   Each of the five cases involved a person restraining another person with either a firearm, through physical assault, or refusing to stop a vehicle to let the passenger out.[103]   Here, and as argued *supra*, Mr. Rahdar did not restrain a person.   Mr. Rahdar pulled up in front of an empty vehicle.[104]   Mr. Rahdar was not even aware that Sgnt. Cordero had entered the vehicle.[105]

After Plaintiffs filed this lawsuit, FPD Officers were told to "crack down" on Mr. Rahdar.[106]   Coincidentally, after Plaintiffs filed this lawsuit, Mr. Rahdar was arrested again regarding the February 5, 2021, incident and the charge was upgraded to unlawful restraint.[107]

Thus, because Mr. Rahdar did not intentionally or knowingly restraint Sgnt. Cordero, there can be no probable cause for unlawful restraint, either.[108]

---

[100] *See* Ex. J, 122:1-6.
[101] *See* TPC § 20.02(a).
[102] *See* Exhibit P, pgs. 3-4.
[103] *See* Ex. P, pgs. 3-4.
[104] *See* Ex. L, 26:1-20.
[105] *See Davidson*, 848 F.3d at 393; *see also* Ex. L, pgs. 28:7-13 & 42:10-16.
[106] *See* ECF, #83-2, ¶ 29.
[107] *See* Rahdar II.
[108] *See* ECF #70, pg. 9 ¶ 30.

### 3. Rodriguez Report

Sgnt. Cordero was trained pursuant to the Texas Commission on Law Enforcement training standards and "received extensive training on the 4th Amendment."[109] However, Sgnt. Cordero, as a commanding officer, participated in the Targeting Campaign which retaliated against Mr. Rahdar for his speech and operated on the premise of "arresting first, determine legalities later."[110] While Defendants rely upon Albert Rodriguez's ("Mr. Rodriguez") Report[111] which concluded that, "[a]ny well-trained law enforcement officer could have believed that probable cause existed to arrest [Mr.] Rahdar…"[112] it should be noted that Mr. Rodriguez does not mention the Targeting Campaign in his report.[113] While Mr. Rodriguez draws the conclusion that Sgnt. Cordero "could reasonably have believed Mr. Rahdar had intentionally and knowingly blocked [Sgnt. Cordero's] vehicle and his ability to leave the parking space in violation of Texas Penal Code §42.03,"[114] Mr. Rodriguez also states that Sgnt. Cordero was not even in the vehicle when Mr. Rahdar allegedly violated T.P.C. §42.03.[115] While Sgnt. Cordero claims that he moved his truck up to alert Mr. Rahdar, there is no evidence of his claim.[116]

---

[109] *See* Exhibit Q, ¶30.
[110] *See* ECF, #83-2, ¶¶ 3, 7, 9, 13, & 15.
[111] *See* Exhibit R.
[112] *See* ECF #70, pg. 9 ¶ 30.
[113] *See* Ex. R.
[114] *See* Exhibit S.
[115] *See* Ex. N, ¶¶ 17-18.
[116] *See* Exhibit T, ¶ 21; *see also* Ex. A, 1:11:47-1:15:10.

Notwithstanding Mr. Rodriguez's incomplete report, Sgnt. Cordero and Lt. Price, as commanding officers, had direct knowledge of Chief Wieners desire to ruin Mr. Rahdar and his business, Friends Pub.[117]   As commanding officers, both Sgnt. Cordero and Lt. Price were complicit in the Targeting Campaign.[118]   When Sgnt. Cordero ordered Lt. Price to arrest Mr. Rahdar, Lt. Price would have known that probable cause to arrest Mr. Rahdar was sketchy.[119]   Mirroring the Whistleblower, Officer Yodzis, who transported Mr. Rahdar to jail, testified that he "did not know what the situation was.  It was being handled by a whole bunch of people who were my superiors, so I'd just sit back and let them take care of things."[120]   Here, because of the Targeting Campaign and the Whistleblower there can be no probable cause because the "facts and circumstances within the officer's knowledge" were not "sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."[121]

As argued *supra*, probable cause did not exist for the Arrest.

### 4. Intentional Destruction of the Body Worn Camera Footage.

"It is the policy of FPD that officers shall activate the body-worn camera when such use is appropriate to the proper performance of his or her official duties, where the recordings are consistent with this policy and consistent with the Federal Rules of

---

[117] *See* ECF, #83-2, ¶¶ 3, 7, 9, 13, 15 & 29.
[118] *See* ECF, #83-2, ¶¶ 3, 4, 7, 9, 13, 15 & 29.
[119] *See Id*.
[120] *See* Exhibit U, pg. 17:4-11.
[121] *See Kaley v. United States*, 571 U.S. 320, 338 (2014).

Evidence…" ("BWC Policy")[122]  FPD has adopted a BWC Policy to accomplish several

objectives, one of which is to "[e]nhance the department's ability to review for probable

cause for arrest…".[123]  The second objective is "[e]nhance the accuracy of officer reports

and testimony…by using [BWC] to allow for accurate documentation of…arrests…"[124]

Body-worn camera would have been activated during the arrest because the Arrest was

considered an enforcement action.[125]

Here, the BWC Policy required at least two Defendants to have activated their

body worn cameras to record the arrest of Mr. Rahdar.[126]  These two officers included

Officer Yodzis,[127] who transported Mr. Rahdar from the scene, and Lt. Price[128] who

handcuffed Mr. Rahdar.  According to Mrs. Ghorbani, Lt. Price even told Sgnt. Cordero

that Sgnt. Cordero should not have arrested Mr. Rahdar.[129]  Lt. Price's body worn camera

would have picked up these statements.[130]

Given that the information available to Sgnt. Cordero and Lt. Price at the time of

Rahdar's arrest indicated that (1) Sgnt. Cordero and Lt. Price were knowledgeable

and/or complicit in the Targeting Campaign;[131] (2) Sgnt. Cordero had surveilled the

---

[122] *See* ECF, #70-23, pg. 1.
[123] *Id.*
[124] *Id.*
[125] *See* Ex. B, 22:23-23:17.
[126] *See* Ex. B, pgs. 22:5-6; 27:2-3
[127] *See* Ex. U, pgs. 20:12-21:3.
[128] *See* Ex. B, 14:5-8.
[129] *See* Ex. B, pg. 33:18-24; *see also* Exhibit V.
[130] *See* Ex. B, pg. 33:11-17
[131] *See* Ex. U, pg. 17:4-11; *see also* ECF, #83-2, ¶¶ 3, 4, 7, 9, 13, 15, & 29.

Friends Pub parking lot for forty-five (45) minutes prior to his haircut;[132] (3) Mr. Rahdar was stopped in front of any empty unmarked FPD vehicle;[133] and (4) without asking Mr. Rahdar to move, Sgnt. Cordero entered his vehicle and immediately called for law enforcement backup,[134] probable cause did not exist at the time Sgnt. Cordero ordered the Arrest.

Officer Kulhanek, who was not at the scene, was listed as the arresting officer[135] and as the officer who filed the complaint.[136] However, Defendant Kulhanek testified that he would not have arrested and charged Mr. Rahdar with any crime for the February 5, 2021 incident.[137] Notably, because Officer Kulhanek was not at the scene of the arrest, there would have been no body worn camera footage to attach to the arrest report.[138] Thus, even though Lt. Price effectuated the arrest and would have had his body worn camera on, he was not listed as the arresting officer for purposes of the arrest report. The Whistleblower stated that the bodycam and dashcam footage of the Fourth Arrest was intentionally destroyed.[139]

---

[132] *See* Ex. L, 9:3-10:7; *see also* Ex. A, 14:34; 44:25; *see also* ECF, #83-2, ¶ 10.
[133] *See* Ex. L, 26:1-20; *see also* Ex. A, 1:01:52.
[134] *See* Ex. L, 24:2-10; *see also* Ex. J, 33:8-34:15; *see also* Ex. A, 1:11:32.
[135] *See* Exhibit W.
[136] *See* Ex. W.
[137] *See* Ex. G, 42:25-43:10; *see also* Ex. L, 41:17-42:9.
[138] *See* Ex. B, pgs. 31:6-32:3.
[139] *See* ECF, #83-2, ¶ 16.

Chief Deputy Erik Reyna testified that Officer Kulhanek and his Field Training Officer, who at that time was Sgnt. Wilkerson,[140] would have made the decision as to whether body worn camera or dash camera footage was preserved and attached to the arrest report.[141] While recorded video "shall be retained through the final disposition of the related criminal case," the arresting officer has to actually submit the evidence.[142] Here, there is no proof that the body worn camera or dash camera footage was ever submitted into evidence.[143] Moreover, Sgnt. Cordero began recording on his cell phone as soon as he exited Q-Cuts and stepped onto the parking lot[144] and continued to record until he entered his vehicle.[145] This recording was never attached to the arrest report, nor was it disclosed during discovery. Officers who are not in uniform do not wear body worn cameras and instead use their personal cell phones to record interactions with the public.[146]

It was objectively unreasonable for Sgnt. Cordero and Lt. Price to conclude that there was probable cause to arrest Mr. Rahdar under § 42.03 and § 20.02.

---

[140] *See* Ex. G, pgs. 10:22-11:4.
[141] *See* Ex. FF, 32:18-34:25.
[142] *See* Ex. FF, 56:8-20.
[143] *See* Ex. FF, 56:8-20.
[144] *See* Ex. A, 1:11:20.
[145] *See* Ex. A, 1:11:53.
[146] *See* Ex. FF, 27:9-19.

**B.** **Genuine Disputes of Material Facts Exist Regarding Mr. Rahdar's First Amendment Retaliatory Arrest Claim.**

This country enjoys a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."[147] "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech,[148] "including criminal prosecutions for speaking out."[149] This is because the First Amendment "protects a significant amount of verbal criticism and challenge directed at police officers."[150] Indeed, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."[151]

The undisputed facts show that because Mr. Rahdar verbally opposed and challenged police action, FPD reacted by targeting, harassing, intimidating and arresting Mr. Rahdar and Mrs. Ghobrani in a concerted effort to silence them

---

[147] *See New York Times Co. v. Sullivan*, 376 U.S. 254, 269-70 (1964)(citing *Terminello v. Chicago*, 337 U.S. 1,4 (1949)); *see also De Jonge v. Oregon*, 299 U.S. 353, 365 (1937).

[148] *See Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).

[149] *See Gonzalez v. Trevino*, No. 22-1025 at pgs. 4-5 (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).

[150] *See City of Houston v. Hill*, 482 U.S. 451, 461 (1987).

[151] *City of Houston*, 482 U.S at 463-64; *see also Seals v. McBee*, 898 F.3d 587, 600 (5th Cir. 2018) (explaining that the right to verbally challenge police action is a "core First Amendment freedom").

### i.      Mr. Rahdar Was Engaged in Protected Speech When He was Targeted by Defendants.

Mr. Rahdar was engaged in constitutionally protected speech when he created a billboard and a website criticizing Chief Wieners and FPD, as well as when he gave interviews with various media outlets discussing the Targeting Campaign against Mr. Rahdar, Mrs. Ghorbani and Friends Pub.[152]  Moreover, Sgnt. Cordero testified that after he talked to his barber about the wait time and returned to wait in his vehicle, he became aware that Mr. Rahdar who was videotaping him.[153]  Finally, Defendants used the Targeting Campaign to retaliate against Plaintiff's protected speech.[154]

Due to Mr. Rahdar's very critical publicity campaign against Chief Wieners and FPD and the Targeting Campaign, Mr. Rahdar was well known within Friendswood Police.  Prior to 2020, Mr. Rahdar had never been arrested.  However, between August 3, 2020 and February 5, 2021, FPD arrested Mr. Rahdar on at least four separate occasions.[155]  Being arrested on four separate occasions would clearly "chill a person of ordinary firmness from continuing to engage" in constitutionally protected activity.[156]  Moreover, FPD Officers targeted Friends Pub through bar checks and complaints to the

---

[152] *See City of Houston*, 482 U.S. at 461.
[153] *See* Ex. J, 28:3-16; *see also Turner v. Lieutenant Driver*, 848 F.3d 678, 689-90 (5th Cir. 2017)("[T]he principles underlying the First Amendment support the particular right to film the police.").
[154] *See* ECF, #83-2, ¶¶ 15, 21, 23, & 29.
[155] *See* ECF, #27, ¶¶ 6, 8, 9, & 10.
[156] *See Alexander v. City of Round Rock*, 854 F.3d 298, 308 (5th Cir. 2017).

Texas Alcoholic Beverage Commission ("TABC").[157]   The Arrest was "substantially motivated" by Mr. Rahdar's prior speech, specifically because the Targeting Campaign was enacted to silence Mr. Rahdar and Mrs. Ghobrani through harassment and acts of intimidation.[158]

Thus, Plaintiff's speech is high in the hierarchy of First Amendment values.[159]

### ii.     Probable Cause Did Not Exist for the Arrest.

As argued *supra*,[160] probable cause did not exist for the Arrest.  However, in the event that the Court is inclined to accept the (disputed) notion that probable cause existed for the arrest, Plaintiff will address the *Nieves*[161] exception to probable cause.

### iii.    Alternatively, If Probable Cause Exists for the Arrest, Mr. Rahdar Engaged in the Type of Conduct That is Unlikely to Result in an Arrest.

"The point of a [retaliatory arrest] claim isn't to guard against officers who lack lawful authority to make an arrest.  Rather, it's to guard against officers who abuse their authority by making an otherwise lawful arrest for an unconstitutional reason."[162]

"Although probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause

---

[157] *See* ECF, #83-2, ¶¶ 21-25.
[158] *See* ECF, #83-2, *gen*.
[159] *Lozman v. City of Riviera Beach*, 585 U.S. 87, 101 (2018)(citing *Connick* v. *Myers*, 461 U. S. 138, 145 (1983)).
[160] *See* Resp. Section V(A)(i)(1), (2), (3) & (4).
[161] *See Nieves*.
[162] *See Nieves*, 587 U.S. at 414.

to make arrests, but typically exercise their discretion not to do so."[163]  Probable cause is not required "when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of speech had not been."[164]  Objective evidence can include, among other things, specific comparator evidence,[165] government arrest statistics,[166] and police officer affidavits from an officer testifying that no one has been prosecuted in the jurisdiction for engaging in similar conduct.[167]

From February 5, 2011 to February 5, 2023, Obstruction, has formed the basis of only three Friendswood Police arrests.[168]  Neither of these arrests include facts which are remotely similar to what occurred to Mr. Rahdar.[169]  For example, in one instance FPD Officers requested that the defendant move his vehicle and the defendant refused[170] and in the other case the vehicle was stopped facing the wrong direction on a major thoroughfare and the operator was drunk.[171]  Regarding the third instance, no facts were

---

[163] *See Nieves*, 587 U.S. at 406.
[164] *See Nieves*, 587 U.S. at 407; *see also Gonzalez*; Defendants argue that *Gonzalez* was not clearly established at the time Sgnt. Cordero and Lt. Price arrested Mr. Rahdar.  However, *Gonzalez* did not create any new law.  *Gonzalez* simply clarifies *Nieves* and the definition of "objective eveidence."  Thus, Defendants attempt to avoid Gonzalez fails.  *See* ECF, #70, pg. 10 fn 7.
[165] *See Gonzalez*, No. 22-1025, pg. 4.
[166] *See Id*. at pg. 9.
[167] *See Id*.
[168] *See* Exhibit X, 33:14-19; *see also* Ex. P, pgs. 2-3.
[169] *See* Ex. X, 33:22-36:17; *see also* Ex. P, pgs. 2-3.
[170] *See* Ex. Y.
[171] *See* Exhibit Z.

disclosed.[172]  Mr. Rahdar was arrested after stopping in front of an empty police car in a private parking lot where the police officer snuck back into his vehicle without ever requesting that Mr. Rahdar move and immediately called in the cavalry.[173]

During the last ten years, FPD has effectuated five (5) arrests for unlawful restraint.[174]  Each of the five cases involved a person restraining another person with either a firearm, through physical assault, or refusing to stop a vehicle to let the passenger out.[175]  Here, and as argued *supra*, Mr. Rahdar did not restrain a person.  Mr. Rahdar pulled up in front of an empty vehicle.[176]  Mr. Rahdar was not even aware that Sgnt. Cordero had entered the vehicle.[177]

Additionally, the Whistleblower effectuated 450-500 arrests during the three (3) years he was employed at FPD.[178]  The Whistleblower had never arrested anyone for obstructing a highway or other passageway.[179]  Nor had he ever arrested anyone for unlawful restraint.[180]  Lt. Price also testified that after working in law enforcement for twelve (12) years he "had never arrested anyone for obstructing a parking lot."[181]  Officer

---

[172] *See* Ex. P, pgs. 2-3.
[173] *See* Exhibit AA, 13:16-20; 14:8-13.
[174] *See* Ex. P, pgs. 3-4.
[175] *See* Ex. P, pgs. 3-4.
[176] *See* Ex. L, 26:1-20.
[177] *See Davidson*, 848 F.3d at 393; *see also* Ex. L, pgs. 28:7-13 & 42:10-16.
[178] *See* ECF, #83-2, ¶¶ 30-31.
[179] *Id.*
[180] *Id.*
[181] *See* Ex. B., 34:22-35:1.

Wilkerson had never arrested anyone for obstructing a highway or other passageway.[182]

Sgnt. Cordero has been with FPD since 1996; however, Sgnt. Cordero could not recall

FPD arresting anyone for obstruction during that time.[183]   Officer Rogers testified that

there is always discretion as to whether you arrest someone for obstruction.[184]

Defendants argue that the law was not clearly established at the time of Mr.

Rahdar's arrest because the Supreme Court decided *Gonzales v. Trevino*[185] after Sgnt.

Cordero and Lt. Price arrested Mr. Rahdar.   However, *Gonzalez* did not create any new

law.  *Gonzalez* simply clarifies *Nieves* and the definition of "objective evidence."   Thus,

Defendants attempt to avoid *Gonzalez* are inapposite.

There is no evidence that FPD has ever effectuated an arrest even remotely similar

to the Arrest.  This is because it is unheard of for an officer to arrest a citizen for stopping

in front of an empty vehicle to ask a question.

> iv.    **The Arrest Violated Mr. Rahdar's First Amendment Rights, Because the Arrest Was in Retaliation for Mr. Rahdar's Public Disparagement of FPD and Chief Wieners.**

"An official retaliatory policy is a particularly troubling and potent form of

retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot

decision by an individual officer."[186]   "This unique class of retaliatory arrest claims,

---

[182] *See* Ex. F, 24:16-21.
[183] *See* Ex. J, 123:4-7.
[184] *See* Ex. AA, 44:3-6.
[185] 144 S.Ct 1663 (2024); *see also* ECF, #70, pg. 10 fn 7.
[186] *Lozman*, 585 U.S. at 100.

moreover, will require objective evidence of a policy motivated by retaliation to survive summary judgment."[187]

As an initial matter, the Whistleblower has described a concerted Targeting Campaign against Mr. Rahdar, Mrs. Ghorbani and Friends Pub.[188] The Targeting Campaign exemplifies retaliatory animus and was not enacted in good faith.[189] Moreover, Sgnt. Cordero and Lt. Price as commanding officers had knowledge of Chief Wieners' animus as well as Mr. Rahdar's public disparagement of Chief Wieners and FPD.[190] Mr. Rahdar's conflict with Chief Wieners was common knowledge at FPD.[191] Defendants retaliated against Mr. Rahdar pursuant to an official municipal policy of intimidation.[192] Chief Wieners and his commanding officers "formed a premediated plan to intimidate him, [Mrs. Ghorbani and Friends Pub] in retaliation for [Mr. Rahdar's] criticisms of FPD officials."[193] FPD through it highest ranking officers executed the Targeting Campaign through bar checks, arrests, targeting customers of Friends Pub, and surveillance.

---

[187] *Lozman*, 585 U.S. at 100-01.
[188] *See* ECF, #83-2, *gen*; *see also* Resp., ¶¶ 7-12.
[189] *Lozman*, 585 U.S. at 99 ( "…Lozman does not sue the officer who made the arrest. Indeed, Lozman likely could not have maintained a retaliation claim against the arresting officer in these circumstances, because the officer appears to have acted in good faith, and there is no showing that the officer had any knowledge of Lozman's prior speech or any motive to arrest him for his earlier expressive activities.")
[190] *See* ECF, #83-2, *gen*.
[191] *See* Ex. B, pg. 41:1-20; *see also* Ex. G, pg. 28:13-25; Exhibit BB, 39:21-40:5; Exhibit CC, 51:2-52:20; Exhibit DD, pg. 17:8-10.
[192] *See* ECF, #83-2, *gen*.
[193] *Lozman*, 585 U.S. at 99; *see also* Ex. J, pgs. 89:14-90:4; 91:10-25; 92:1-2; 120:7-23; 121:2-7; *see also* Ex. B, pgs. 39:19-22; 41:6-14; 42:1-5; 42:6-8, 15-17.

After Mr. Rahdar was handcuffed, Mrs. Ghobrani pulled up in her vehicle. While Sgnt. Cordero was aware that Mrs. Ghobrani was Mr. Rahdar's wife and that Mr. Rahdar's business was in the parking lot, Sgnt. Cordero demanded that Mr. Rahdar's truck be towed.[194] Lt. Price had to step in and override Sgnt. Cordero's demands.[195]

"[T]he First Amendment operates independently of the Fourth and provides different protections. It seeks not to ensure lawful authority to arrest but to protect the freedom of speech."[196] The Targeting Campaign is the coup de grace for Defendants. The entire reason the Targeting Campaign was enacted was to silence Plaintiffs. An official policy of harassment and intimidation directed towards two citizens and their business is not only unconstitutional, but also illegal.

## C. Qualified Immunity Does Not Apply to Defendants' Actions.

In the Fifth Circuit, a police officer's qualified immunity defense defeats a plaintiff's allegation of arrest without probable cause where "a reasonable officer could have believed the arrest at issue to be lawful, in light of clearly established law and the information the arresting officers possessed."[197] "The relevant, dispositive inquiry in

---

[194] *See* Ex. V.
[195] *See* Ex. V.
[196] *See Nieves*, 587 U.S. at 414.
[197] *See Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000)(quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)); *see also Huang v. Hill*, No. 3:15-cv-269, 2017 WL 68465 (S.D. Tex. Jan. 6, 2017), aff'd, 792 F.App'x 392 (5th Cir. 2020).

determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[198]

Defendants argue that "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."[199]  However, Plaintiffs do not allege Defendants made a "mistake" when they arrested Mr. Rahdar.  Instead, Plaintiffs allege an official policy to take Mr. Rahdar, his wife and his business down, where FPD Officers conspired and enacted a Targeting Campaign to ultimately ruin Mr. Rahdar and Mrs. Ghorbani's lives.[200]

### i. An Arrest Without Probable Cause Violates Clearly Established Law and Defendants' Actions Were Objectively Unreasonable.

"A warrantless arrest without probable cause violates clearly established law defining an individual's rights under the Fourth Amendment.[201]  Federal case law, which was clearly established at the time of Mr. Rahdar's arrest in 2021,[202] shows that an arrest without probable cause violates Mr. Rahdar's Fourth Amendment rights.[203]

---

[198] *See Bevill v. Fletcher*, 26 F.4th 270, 279 (5th Cir. 2022)(quoting *Lytle v. Bexar Cnty.*, 560 F.3d 404, 410 (5th Cir. 2009)(quotation omitted)).

[199] *See* MSJ, pg. 12, ¶ 35.

[200] *See* ECF, #83-1 & 83-2 *gen.*

[201] *Davidson*, 848 F.3d at 391(citing *Hogan v. Cunningham*, 722 F.3d 725, 731 (5th Cir. 2013)).

[202] *See Club Retro LLC v. Hilton*, 568 F.3d 181, 206 (2009) ("The Fourth Amendment right to be free from false arrest—arrest without probable cause—was clearly established at the time of [the] arrest[] [in 2021]."); *Keenan v. Tejada*, 290 F.3d 252, 262 (2002) ("If no reasonable police officer could have believed that probable cause existed for the law enforcement actions of [the

"To be 'clearly established' for purposes of qualified immunity, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"[204] "The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'"[205]

*Club Retro LLC v. Hilton*, 568 F.3d 181, 194-95 (5th Cir. 2009)

Here, Defendants were knowledgeable regarding the Targeting Campaign.[206] When Sgnt. Cordero, a commanding officer,[207] radioed Defendants demanding officer assist for a situation (which Sgnt. Cordero created[208]) involving Mr. Rahdar in the Friends Pub parking lot,[209] all Defendants would have known that probable cause was questionable at best.[210] FPD Officers have discretion regarding how they respond to assist another officer with an arrest.[211] Indeed, that is one of the reasons Officer Sara

<hr/>

officers] against the plaintiffs, then their retaliation violated clearly established law of this circuit." (citing *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996)).

[203] *See Davidson*, 848 F.3d at 393-94.

[204] *See Id.* (citing *Kinney v. Weaver*, 367 F.3d 337, 349-50 (5th Cir. 2004) (en banc) (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))).

[205] *Id.* (citing *Kinney*, 367 F.3d at 350 (en banc) (alteration in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740, (2002))).

[206] *See* ECF, #83-2 ¶¶ 3-4, 6-10, 12, 14-24, 29, & 32; *see also* ECF, #83-1 *gen.*

[207] *See* ECF, #83-2 ¶¶ 3, 4, 7, 9, & 13.

[208] *See* Resp. *supra*, pgs. 12-13.

[209] *See* Ex. B, 15:23-16:12.

[210] *See* ECF, #83-2 *gen.*; *see also* ECF, #83-1 *gen.*

[211] *See* Exhibit EE.

Carter was investigated by FPD internal affairs. Her co-workers were reluctant to assist with any of her arrests due to the "legality of her stops."[212]

When Lt. Price arrived on scene and Mr. Rahdar was calmly leaning against his truck and Sgnt. Cordero ordered that Lt. Price arrest Mr. Rahdar, a reasonable officer in Lt. Price's circumstances would have questioned the probable cause for the arrest.[213] Sgnt. Cordero would not even allow Lt. Price to interview Mr. Rahdar.[214] Lt. Price even told Sgnt. Cordero he should not have arrested Mr. Rahdar.[215] However, officers have discretion regarding whether to arrest a suspect.[216] Yet, Lt. Price complied with Sgnt. Cordero's demands.[217] In light of the Targeting Campaign, "…[D]efendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of."[218]

As argued *supra*,[219] Mr. Rahdar stopped in front of Sgnt. Cordero's empty vehicle and was completely unaware when Sgnt Cordero re-entered his vehicle. There can be no probable cause for either Obstruction or Unlawful Restraint.

ii.  **Arresting Mr. Rahdar Because of His Speech Violates Clearly Established Law and Defendants' Actions Were Objectively Unreasonable.**

---

[212] *See* Ex. EE.
[213] *See* V(A)(i)(1)(2)(3) & (4); *see also* Ex. A, 1:15:24; *see also* ECF, #83-2 *gen*.
[214] *See* Ex. L, 37:20-24.
[215] *See* Ex. V; *see also* Ex. B, 17:1-20.
[216] *See* Ex. B, 14:24-15:4.
[217] *See* Ex. B, 14:5-8.
[218] *See Club Retro LLC*, 568 F.3d at 194-95 (citations omitted).
[219] *See* Ex. L, 26:1-20; *see also Davidson*, 848 F.3d at 393; *see also* Ex. L, pgs. 28:7-13 & 42:10-16.

"[I]n order to bring a First Amendment claim for retaliatory arrest, a plaintiff generally must first show the absence of probable cause for the arrest, *i.e.*, a Fourth Amendment violation."[220]   However, pursuant to the First Amendment, an arrest supported by probable cause can also violate the First Amendment.[221]

As argued *supra*, because Mr. Rahdar publicly disparaged FPD and Chief Wieners, Mr. Rahdar, Mrs. Ghobrani and Friends Pub were relentlessly pursued by FPD.  But for Mr. Rahdar speaking out publicly about FPD targeting his business for remaining open during the COVID-19, the Targeting Campaign and the Arrest would have never occurred.  Posting Mr. Rahdar and Mrs. Ghobrani's pictures, cars, and license plates on bulletin boards, FPD treated Mr. Rahdar and Mrs. Ghobrani as if they were "wanted."

Even if Mr. Rahdar had not been exercising core First Amendment rights when, for months, he publicly disparaged Chief Wieners and FPD, Mr. Rahdar was not (even arguably) in violation of § 42.03 or § 20.02 when he waited for Sgnt. Cordero in front of Sgnt. Cordero's <u>empty</u> vehicle.  Sgnt. Cordero never requested that Mr. Rahdar move his vehicle, because Sgnt. Cordero was resolute in his decision to have Mr. Rahdar arrested.[222]   Additionally, Mr. Rahdar's right to publicly disparage FPD prohibited the

---

[220] *Mayfield v. Snow*, 75 F.4th 494, 500 (5th Cir. 2023) (citing *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019)).
[221] *See Nieves supra*; *see also Lozman*, *supra*.
[222] *See* Ex. J, 36:1-7.

Targeting Campaign and Sgnt. Cordero and Lt. Price's application of §§ 42.03 and 20.02 in the manner employed here.

The objective unreasonableness displayed by Sgnt. Cordero and Lt. Price in the face of law clearly establishing Mr. Rahdar's rights leads to only one conclusion. Qualified immunity cannot shield their actions. "[E]very reasonable official would have understood that what [Sgnt. Cordero and Lt. Price] [did] is violat[ing]" Mr. Rahdar's rights.[223] Officer Yodzis alluded to the Targeting Campaign, when he aptly described his "surprise" when he arrived at the Arrest scene and saw how many "gold-badge officers"[224] had swarmed the scene. However, according to Officer Yodzis at FPD "[m]anagement is fairly proactive. They get involved. They get their hands dirty."[225] Indeed.

## VI. CONCLUSION

It is clear that FPD has a history of disregarding probable cause for warrantless arrests, as well as training its officers on the "art" of effectuating unlawful searches and seizures. The Targeting Campaign was just another chapter in Chief Wieners and FPD's book of corruption. Every officer who arrived to "assist" Sgnt. Cordero on February 5, 2021, would have reasonably known that enacting and enforcing a Targeting Campaign against Plaintiffs and their business was unlawful. Therefore, due

---

[223] *See Davidson*, 848 F.3d at 393-394 (quoting *Reichle v. Howards*, 566 U.S. 658 (2012) (citation omitted)).
[224] *See* Ex. U, pg. 33:9-25.
[225] *See* Ex. U, pg. 33:22-25.

to the Targeting Campaign, Defendants would have known that probable cause did not exist for the Arrest. The lack of probable cause is bolstered by the fact that body worn camera footage was eliminated and not linked to the arrest report. Because Defendants designated Officer Kulhanek as the arresting officer, an officer who was not present at the scene, Officer Kulhanek would not have had body worn camera footage to link to the arrest report. Thus, for all the reasons argued *supra*, Defendants' Motion for Summary Judgment should be denied.

Respectfully Submitted,

/s/ Jared Woodfill
Jared Woodfill
State Bar No. 00788715
Fed. Bar No. 17069
WOODFILL LAW FIRM
3 Riverway, Suite 750
Houston, TX 77056
Telephone: (713) 751-3080
FAX: (713) 751-3058
E-mail: jwoodfill@woodfilllaw.com

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel for all parties of record on October 15, 2024, in accordance with the Federal Rules of Civil Procedure.

*/s/ Jared R. Woodfill*
Jared R. Woodfill
Attorney for Plaintiffs